**Not for Publication**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JONATHAN GOULD,<br><br>　　　　　　*Plaintiff*,<br><br>v.<br><br>DETECTIVE ROBERT O'NEAL, *et al.*,<br><br>　　　　*Defendants*. | Civil Action No. 17-100<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

Presently before the Court is a motion for summary judgment filed by Defendants Robert O'Neal and John Campo.  D.E. 99.  Plaintiff Jonathan Gould filed a brief in opposition, D.E. 105, to which Defendants replied, D.E. 107.  The Court reviewed all submissions[1] made in support and opposition of the motion and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).  For the reasons that follow, Defendants' motion is **GRANTED**.

---

[1] Defendants' brief in support of their motion (D.E. 99-100) will be referred to as "Defs. Br."; Plaintiff's brief in opposition (D.E. 105) will be referred to "Plf. Opp."; and Defendants' reply brief (D.E. 107) will be referred to as "Defs. Reply".  Defendants also rely on the Certification of Brett J. Haroldson ("Haroldson Cert.") and the attached exhibits (D.E. 99-2 – -8), in addition to their Statement of Material Facts Not in Dispute ("DSOMF") (D.E. 99-9).  Plaintiff relies on the Declaration of David B. Shanies ("Shanies Decl.") and the attached exhibits (D.E. 106), in addition to his Counterstatement and Statement of Additional Material Facts ("PSOMF") (D.E. 95-1).

I.      **FACTUAL BACKGROUND**[2] **AND PROCEDURAL HISTORY**

During the relevant timeframe, Plaintiff's mother, Carol Gould, was 83 years old and resided in a nursing home in West Orange, New Jersey.  DSOMF ¶ 2.  On March 25, 2014, Chase Bank USA notified JP Morgan Chase Bank Global Security and Investigations ("GS&I") of suspected elder financial exploitation involving Carol Gould.  *Id.* ¶ 1.  Plaintiff was an authorized user for several of his mother's credit cards and listed as power of attorney for multiple bank accounts in her name.  The following accounts are pertinent: Carol Gould's personal checking account ending in 8794 and her credit card accounts ending in 9624, 6000, and 9894.  *Id.* ¶¶ 18, 20, 21, 43, 48.[3]

A power of attorney (the "POA") permitted Plaintiff as attorney-in-fact to, among other things, conduct banking transactions on Carol Gould's behalf, including making bank withdrawals to pay bills.  *Id.* ¶ 51; *see also* Shanies Decl., Ex. 7 (the "POA") at ¶ 2.  Paragraph 4 of the POA also permitted Plaintiff  to do the following:

---

[2] The factual background is taken from DSOMF; PSOMF; the Haroldson Cert. and attached exhibits; and the Shanies Decl. and attached exhibits.  As the parties are familiar with this matter, the Court recounts the key relevant facts here, and additional facts are discussed in the Analysis section below.

[3] In responding to DSOMF, Plaintiff objects to numerous paragraphs, asserting that Defendants are relying on a document that is inadmissible hearsay and unauthenticated.  *See, e.g.*, PSOMF, Response to ¶ 43.  The document at issue is financial records from GS&I, that were ultimately provided to the Essex County Prosecutor's Officer ("ECPO").  *See* Haroldson Cert., Ex. A.  Neither party addresses this issue in their briefs.  Thus, the Court notes that hearsay statements "can be considered on a motion for summary judgment if they are capable of being admissible at trial." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (internal quotation omitted); *see also* Fed. R. Civ. P.  56(c)(2).  In deciding a motion for summary judgment, "the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial."  *Fraternal Order of Police, Lodge 1*, 842 F.3d at 238. Here, the Court concludes that the records could be admissible at trial, for example, through a GS&I witness establishing a business records foundation or to show the effect on the listener.  Accordingly, the Court will consider the exhibit in deciding this motion.

To make gifts to any one or more of my descendants, and/or to a trust established for the benefit of any one or more of my descendants (including the power to make gifts to himself or herself[4] while any of my descendants shall be acting as my attorney-in-fact); PROVIDED, HOWEVER, that (i) in any calendar year the gift to an descendant of mine must qualify for the annual exclusion described in Section 2503(b) of the Internal Revenue Code of 1986, as amended (the "Code") . . ., or (ii) the gift to any descendant of mine must be a transfer described in Section 2503(e) of the Code, or (iii) the gift to any descendant of mine in excess of said annual exclusion, as specified in subparagraph (i) of this paragraph 4, shall provide for such descendants' s health, education, maintenance and support but only to the extent that such gift shall not be deemed to discharge any obligation of support owed by my said attorney-in-fact.  I grant this power notwithstanding that any transaction hereunder may inure to the benefit of my attorney-in-fact and, consequently may be affected by a substantial conflict of interest on the party of my attorney-in-fact[.]

POA ¶ 4.  The parties appear to agree that the IRS gift tax parameters at the time were $14,000.  Thus, as will be discussed, the critical language turns on exceeding the gift tax parameters to provide for a descendant's "health, education, maintenance and support" (the "HEMS clause").  *Id.*

GS&I reviewed the purchases on the three credit card accounts named above, which totaled $530,176.08, for the period between June 6, 2011, and May 5, 2014.  DSOMF ¶¶ 43, 46.  This amount was subsequently paid from Carol Gould's personal checking account ending in 8794.  *Id.* ¶ 48.  Approximately $355,000 of the total charges were payments to Carol Gould's nursing home.  *Id.* ¶ 47.  Through its internal investigation, GS&I concluded that Plaintiff used the remaining amount, approximately $171,000, on personal purchases, including trips to multiple states and

---

[4] The POA named Plaintiff's sister as a successor attorney-in-fact.  POA at 1.

Mexico.[5]  *Id.* ¶¶ 49, 58.  Moreover, "GS&I found sufficient information to name [Gould] as the suspect in its investigation."  *Id.* ¶ 50.

On May 22, 2014, a GS&I investigator contacted the Essex County Prosecutor's Office ("ECPO") Financial Crimes Unit to report the suspected theft.  *Id.* ¶ 52.  The investigator later provided the ECPO with the relevant banking documents.  *Id.* ¶ 56.  The matter was assigned to Assistant Prosecutor Robert Grady and Defendant Detective O'Neal.  *Id.* ¶ 57.  O'Neal was an investigator at the ECPO assigned to the Financial Crimes Unit, and Grady was a prosecutor in the same unit.  PSOMF ¶ 1; DSOMF ¶ 61.  O'Neal contacted Gould on February 4, 2015, to arrange an interview at the ECPO.  Gould voluntarily agreed to come to the ECPO on February 13, 2015.  DSOMF ¶ 63.  Then, on February 11, 2015, Assistant Prosecutor Robert Grady decided that Plaintiff should be charged with second degree theft.[6]  *Id.* ¶ 64.

When Gould arrived at the ECPO on February 13, he met with O'Neal and Defendant Sergeant (now Lieutenant) Campo.  *Id.* ¶ 65.  Campo was O'Neal's direct supervisor at the time.  PSOMF ¶ 24.  O'Neal advised Gould of his *Miranda* rights at the outset.  DSOMF ¶ 65.  Gould began asking questions because O'Neal had told Gould on the phone that he was not a suspect in any investigation.  *Id.* ¶ 67; PSOMF, Response to ¶ 67.  After some back and forth between Plaintiff and Defendants, according to Defendants, Plaintiff refused to acknowledge that he understood his

---

[5] The parties do not discuss the potential tax implications to Carol Gould (or Plaintiff) as to Plaintiff's use of the $171,000.

[6] Plaintiff disputes this fact, PSOMF, Response to ¶ 64, but it is not clear what the dispute is. Plaintiff indicates that Defendant O'Neal signed the summons and complaint and that O'Neal testified that he may not have served the document on Plaintiff if Plaintiff had provided a satisfactory explanation during the scheduled interview.  *Id.*  Plaintiff accurately recounts the record but does not address the factual issue, that is, whether Grady made the decision to charge Plaintiff.  As will be discussed below, there is no dispute that an assistant prosecutor had to approve the charge before a final charging decision was made.

rights,[7] so Campo terminated the interview.  DSOMF ¶¶ 68-69.  During this exchange, Campo told Plaintiff, among other things, that "you don't control the situation, we do."  PSOMF ¶ 23.

After Campo said he was terminating the interview, the discussion continued.  During the conversation, Campo told Gould that "we're going to give some paperwork to you and then you're free to leave" and again, that "we control the situation."  PSOMF ¶ 23; Haroldson Cert., Ex. D at T157:11-159:2; T164:2-8.  O'Neal then served Plaintiff with a summons complaint charging him with theft in violation of N.J. Stat. Ann. § 2C:20-3(a).  DSOMF ¶ 70.  Once served, Campo said "we need you to stay there until we turn off the camera."  Haroldson Cert., Ex. D at T167:25-7.  The parties provided the Court with a video of the interview.  *See Id.*, Ex. G; Shanies Decl., Ex. 4.  The video is approximately eight and one-half minutes long.  Over sixty seconds in the beginning of the video is of an empty room, and O'Neal and Campo do not enter the room until about three minutes into the video.  *Id.*  Thus, the interaction between Plaintiff and Defendants lasted less than five and one-half minutes.  Finally, Plaintiff, O'Neal, and Campo all left the room before the camera was turned off.  *Id.*  While not explicitly stated, the Court presumes that Gould left the ECPO after exiting the room.

Plaintiff appeared for his arraignment on February 26, 2015.  DSOMF ¶ 74.  A few days later, Carol Gould executed an affidavit stating that she was aware of Plaintiff's expenditures from her accounts and that he had "*carte blanche*" to utilize her funds.  *Id.* ¶ 78.  During a later interview with Carol Gould, O'Neal confirmed Carol Gould's statements from the affidavit.  *Id.* ¶ 79.  As a result, Grady executed an administrative dismissal of the criminal case on March 4, 2015.  *Id.* ¶ 80.

---

[7] Plaintiff claims that he understood his rights but that he did not understand why he was being read his rights.  PSOMF, Response to ¶ 67.  The distinction is not material to the Court's decision.

5

Plaintiff filed his initial Complaint on January 6, 2017, asserting claims of false arrest (Count One) and malicious prosecution (Count Two), both in violation of 42 U.S.C. § 1983. Plaintiff asserted claims against O'Neal, Campo, and Grady.  D.E. 1.  The three Defendants moved to dismiss pursuant to Federal Rule of Civil Procedure (12)(b)(1) and Rule 12(b)(6).  D.E. 22.  The Court granted Defendants' motion on February 8, 2018, and provided Plaintiff leave to file an amended complaint.  D.E. 30, 31.  Plaintiff filed his Amended Complaint on February 13, 2018, reasserting the same claims.  D.E. 32.  Grady subsequently filed a motion to dismiss.  D.E. 34.  On July 18, 2018, the Court granted Grady's motion, and he was dismissed as a defendant in this matter with prejudice.  D.E. 50.  O'Neal and Campo filed an answer to the Amended Complaint. D.E. 35.

On June 24, 2021, O'Neal and Campo were granted leave to file a motion for summary judgment, D.E. 96, which they then did, D.E. 99.

## II.  SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment.  *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at

255)).  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party.  *Anderson*, 477 U.S. at 250.  "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment."  *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  *Celotex Corp.*, 477 U.S. at 322.  "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 250-51.

## III.    ANALYSIS

Defendants seek summary judgment on both counts of the Amended Complaint.  As noted, Plaintiff asserts claims pursuant to 42 U.S.C. § 1983, which, in relevant part, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in an action
at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle for

vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

To prove a Section 1983 claim, a plaintiff must demonstrate that (1) a person deprived him of a

right secured by the Constitution or federal law; and (2) the person who deprived him of that right

acted under color of state law. *Velez v. Fuentes*, No. 15-6939, 2016 WL 4107689, at *2 (D.N.J.

July 29, 2016). There is no dispute that Defendants acted under color of state law for purposes of

Section 1983. Thus, the focus is on whether either Defendant violated Plaintiff's constitutional

rights.

Plaintiff asserts his false arrest and malicious prosecution claims pursuant to the Fourth

and Fourteenth Amendments. Am. Compl. at 9-11. Defendants seek summary judgment for

Plaintiff's Fourteenth Amendment claims pursuant to the "more specific provision" rule. Defs.

Br. at 31-33. The rule provides that "if a constitutional claim is covered by a specific constitutional

provision . . . the claim must be analyzed under the standard appropriate to that specific provision,

not under the rubric of substantive due process." *DeLade v. Cargan*, 972 F.3d 207, 210 (3d Cir.

2020) (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)). A false arrest or

imprisonment claim that is based on the lack of probable cause "is grounded in the Fourth

Amendment's guarantee against unreasonable seizures." *Groman v. Township of Manalapan*, 47

F.3d 638, 636 (3d Cir. 1995). A malicious prosecution claim also arises under the Fourth

Amendment. *Halsey v. Pfeiffer*, 750 F.3d 273, 292 (3d Cir. 2014). Accordingly, the Court will

analyze Plaintiff's claims under the Fourth Amendment. Summary judgment is granted to

Defendants, to the extent that Plaintiff's claims are premised on some other, unspecified Fourteenth Amendment rights, based on the more specific provision rule.[8]

### A.  Prosecutorial Immunity

Next, Defendants contend that they are entitled to absolute prosecutorial immunity.  Defs. Br. at 13-15.  Prosecutors have absolute immunity from federal civil liability for conduct in their role as prosecutors.  With respect to § 1983 claims, prosecutorial immunity applies when the prosecutor's conduct is "'intimately associated with the judicial phase of the criminal process.'" *Fogle v. Sokol*, 957 F.3d 148, 159-60 (3d Cir. 2020) (quoting *Burns v. Reed*, 500 U.S. 478, 493 (1991)).  The Court, however, granted Defendants leave to file a motion for a summary judgment that was limited to the issues raised in their May 18, 2021 letter requesting leave to file the instant motion.  June 24, 2021 Order at 1.  The Court explained that "[i]f additional issues are raised, they will be disregarded by the Court." *Id.* at 1 n.1.  Defendants did not address prosecutorial immunity in their May 18, 2021 letter.  Accordingly, Defendants' prosecutorial immunity argument is disregarded, and Defendants' motion is denied on these grounds.

### B.  Qualified Immunity

Turning to the substance of Plaintiff's claims, Defendants maintain that Plaintiff fails to establish that a constitutional violation occurred, and even assuming such a violation, they are entitled to qualified immunity.  Given that these issues are intertwined, the Court addresses them together.

---

[8] Plaintiff's reference to the Fourteenth Amendment is not entirely clear.  The Court is obviously aware that the Fourth Amendment applies to state officials, including Defendants, because it is incorporated into the Fourteenth Amendment.  *Karnes v. Skrutski*, 62 F.3d 485, 488 n.1 (3d Cir. 1995).  Thus, to the extent Plaintiff included the Fourteenth Amendment on these grounds, Plaintiff's reference to the Fourteenth Amendment is appropriate.  Summary judgment is granted as to Plaintiff's Fourteenth Amendment claims, however, to the extent that Plaintiff is attempting to assert claims based on other rights also covered by the Fourth Amendment.

Qualified immunity can protect a state actor from liability in a Section 1983 case. *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir. 2005). "Qualified immunity shields government officials from personal liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Paszkowski v. Roxbury Twp. Police Dep't*, No. 13-7088, 2014 WL 346548, at *2 (D.N.J. Jan. 30, 2014). A court must engage in the following two-part inquiry to determine whether qualified immunity applies: (1) whether the allegations, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right; and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts have discretion to consider either prong of the two-part analysis first. *Id*. at 236.

"The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). Moreover, qualified immunity is an affirmative defense for which a defendant bears the burden of proof. *See Goldenbaum v. DeLorenzo*, No. 08-1127, 2010 WL 5139991, at *11 (D.N.J. Dec. 10, 2010). In deciding qualified immunity questions at summary judgment, a court must view the facts in the light most favorable to the plaintiff. *Id*.; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). Thus, summary judgment may be granted to a defendant if, when interpreting the facts in the light most favorable to the non-moving party, the court determines that the evidence does not support a violation of a clearly established constitutional right. *Mitchell v. Forsyth*, 472 U.S. 511, 546 (1985) (stating that "when a trial court renders a qualified immunity decision on a summary judgment motion, it must make a legal determination

very similar to the legal determination it must make on a summary judgment motion on the merits"); *see also Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Scott*, 550 U.S. at 378.

### 1.  False Arrest

"An arrest made without probable cause creates a cause of action for false arrest under 42 U.S.C. § 1983." *O'Connor v. City of Philadelphia*, 233 F. App'x 161, 164 (3d Cir. 2007) (citing *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)).  To prove a false arrest claim, a plaintiff must demonstrate that there was an arrest and "that the arrest was made without probable cause." *Islam v. City of Bridgeton*, 804 F. Supp. 2d 190, 197 (3d Cir. 2011).

### a.  Probable Cause[9]

Although they also contest whether Plaintiff was arrested, Defendants contend that probable cause justified any arrest.  Defs. Br. at 17.  "The proper inquiry in a Section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Groman*, 47 F.3d at 634-35 (quoting *Dowling*, 855 F.2d at 141).  "Where the police lack probable cause to make an arrest, the arrestee has a claim under [Section] 1983 for false imprisonment based on a detention pursuant to that arrest."  *Id.* at 636 (quoting *Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir. 1988)).

Probable cause exists if, at the time a suspect is arrested, "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Wright*, 409 F.3d at 602.  In determining whether a police officer had probable cause

---

[9] Lack of probable cause is also an element of Plaintiff's malicious prosecution claim.  *See Allen v. N.J. State Police*, 974 F.3d 497, 502 (3d Cir. 2020) (quoting *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007)).  Thus, the probable cause analysis applies equally to that claim.

to arrest, a court must review the totality of the circumstances of the events leading up to the arrest and must do so from the "standpoint of an objectively reasonable police officer[.]" *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (internal citation omitted). "A police officer may be liable for civil damages for an arrest if 'no reasonable competent officer' would conclude that probable cause exists." *Wilson v. Russo*, 212 F.3d 781, 789-90 (3d Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The existence of probable cause is frequently a question of fact that is not appropriate for resolution through summary judgment. *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997).

The Court addresses three issues as to probable cause: the information supplied by GS&I, the scope of the POA, and the failure to interview Carol Gould. Gould was charged with theft in violation of N.J. Stat. Ann. § 2C:20-3(a). DSOMF ¶ 70. The statute states that "a person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." N.J. Stat. Ann. § 2C:20-3(a).

The information supplied by GS&I certainly contributed to a finding of probable cause. GS&I provided its investigative information to the ECPO, as well as GS&I's conclusion that Plaintiff used Mrs. Gould's money for his personal use. Namely, after an internal investigation, GS&I concluded that there was sufficient information to conclude that Plaintiff used $171,014.20 of Carol Gould's money for his own personal purchases. DSOMF ¶¶ 49, 58. A GS&I investigator contacted the ECPO Financial Crimes Unit on May 22, 2014 to report the suspected theft. *Id.* ¶ 52. The investigator later provided the ECPO with the relevant banking documents, which referenced the POA. *Id.* ¶ 56. Through his review of the banking documents, O'Neal noted that Plaintiff used Mrs. Gould's credit cards for $171,014.20 of personal purchases and her checking account to pay for the credit card purchases. *Id.* ¶ 58. Based on these documents, a reasonable

12

officer could conclude that there was probable cause that Plaintiff was using his mother's funds for his own personal purchases.

Before turning to the scope of the POA, the Court notes that the parties appear to agree that Plaintiff was an authorized user of the credit cards on which he made the relevant trip purchases. The parties also apparently agree that as an authorized user, Gould was permitted to make such purchases. Thus, the critical question becomes whether the POA permitted Plaintiff to use funds from his mother's account to pay the credit card bills. As noted, paragraph 4 of the POA addressed Plaintiff's authority in this regard. The parties appear to agree that the IRS gift tax parameters at the time were $14,000, so this clause of paragraph 4 is of no benefit to Plaintiff. As a result, the critical inquiry is whether Defendants had probable cause to believe that the HEMS clause was not applicable to Plaintiff's personal purchases (including trips to California, Nevada, Texas, Florida, and Mexico) that exceeded the gift tax parameters.

Before this investigation, O'Neal had never seen a power of attorney and lacked a professional understanding of the legal implications of such a document. PSOMF ¶ 12. There is no indication that O'Neal was an attorney by training. Grady, however, was a licensed attorney although, as a prosecutor, not one who practiced in trusts and estates. "The Supreme Court has recognized that 'it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.'" *Kelly v. Borough of Carlisle*, 622 F.3d 248, 254 (3d Cir. 2010) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). An officer may be entitled to qualified immunity under such circumstances. *Id.* In fact, the Third Circuit has explained that "a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under

the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause." *Id.* at 256. Such reliance must be objectively reasonable, but a plaintiff may rebut the presumption "by showing that, under all the factual and legal circumstances surrounding the arrest, a reasonable officer would not have relied on the prosecutor's advice." *Id.* "[T]he touchstone is 'the objective reasonableness' of their belief in the lawfulness of their actions." *Handy v. Palmiero*, 836 F. App'x 116, 119 (3d Cir. 2020) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).

During his deposition, Grady did not recall much about Plaintiff's case. But Grady acknowledged that after GS&I telephonically reported its concerns to the ECPO, Grady asked for a copy of the POA. Haroldson Cert., Ex. E at T44:7-44:25. Grady explained that he wanted a copy of the POA to see what it permitted. *Id.* at T50:9-52:10. Grady further testified that he spoke to the attorney who had drafted the POA. *Id.* at T133:3-135:6. Grady acknowledged that he did not practice in trusts and estates, he did not speak with a trust and estates expert, and he did not research how the IRS interpreted "health, maintenance, and support." *Id.* at T138:20-139:18. But Grady also testified that in his view, Plaintiff's payments from his mother's account for his personal expenditures did not fall within the HEMS clause. *Id.* at T137:16-138:15.

Plaintiff fails to raise a genuine dispute of material fact as to Grady's reading of the HEMS clause or, more importantly, Defendant O'Neal's reasonable reliance thereon. Plaintiff does not produce any evidence to contradict Grady's reading of the HEMS clause. Plaintiff provides no expert report, no IRS guidance as to the scope of the HEMS clause, no caselaw, or any other information that would raise a genuine dispute of material fact. In fact, as the record currently stands, Plaintiff has not produced any evidence demonstrating that the POA did in fact permit him to make the payments from his mother's account for his personal use. Thus, Plaintiff fails to

provide any evidence challenging Defendants' contention that probable cause existed on February 13. Because there is no genuine dispute of material fact as to probable cause, Defendants are entitled to qualified immunity as no constitutional violation occurred.

Plaintiff's arguments as to his mother do not change the Court's conclusion. Plaintiff argues that probable cause did not exist because Defendants could not actually confirm that theft occurred. Plf. Opp. at 17. The probable cause determination is based on "the facts and circumstances within the officers' knowledge" at the time of arrest. *Wright*, 409 F.3d at 602. Plaintiff asserts that probable cause did not exist because Carol Gould approved of all of Plaintiff's charges. Plf. Opp. at 15-17. Plaintiff continues that "[h]ad they taken this simple step of speaking with [Carol Gould], they could, and would have easily confirmed that Plaintiff committed no crime." *Id.* at 17. While speaking with Carol Gould beforehand would have been prudent (and, frankly, expected as there did not appear to be any extenuating circumstances requiring an immediate decision to charge), Plaintiff fails to point to any authority demonstrating that Defendants were legally required to first interview Carol Gould. The cases relied on by Defendants are distinguishable. *See Clipper v. Takoma Park*, 876 F.2d 17, 19-20 (4th Cir. 1989) (upholding jury finding of lack of probable cause because the officers failed to speak to alibi witnesses, failed to review surveillance footage, and another officer had said that while the plaintiff looked like the robber, the officer was not sure)[10]; *Wagenmann v. Adams*, 829 F.2d 196, 206-09 (1st Cir. 1987)

_____

[10] The Fourth Circuit in *Clipper* made clear that mere failure to investigate certain leads was insufficient, standing alone, to negate probable cause:

> We would not suggest that Starkey's failure to investigate the leads that Clipper provided was, in itself, sufficient to negate probable cause. In our view, however, the evidence of that omission, *see BeVier v. Hucal,* 806 F.2d 123, 127–28 (7th Cir.1986), *cited with approval in Sevigny v. Dicksey,* 846 F.2d 953, 957 n. 5 (4th Cir.1988), the evidence of Wortman's statement to

(upholding jury findings of lack of probable cause because there was conflicting evidence which the jury could have credited); *Sevigny v. Dicksey*, 846 F.2d 953, 956-58 (4th Cir. 1988) (upholding jury finding of lack of probable cause because officer charged woman with two offenses that were factually inconsistent and because the officer failed to interview witnesses at the scene); *BeVier v. Hucal*, 806 F.2d 123, 126-28 (7th Cir. 1986) (upholding verdict that officer lacked probable cause as to child neglect because the officer did not have sufficient evidence as to the *mens rea* element; disregarded the opinion of experienced investigator that the case did not appear to be childhood neglect; and failed to interview the parents, the babysitter, or other personnel); *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1345-47 (7th Cir. 1985)[11] (remanding unlawful arrest claim as to probable cause because factual issues existed as to whether officers could reasonably rely on restaurant owner's complaint when small amount of money was involved and the matter was akin to a breach of contract over a meal and also remanding to determine whether an statement was provided in violation of the constitution); *Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1432 (10th Cir. 1984) (upholding finding of lack of probable cause when security guard failed to check

---

Starkey, and the speculative nature of the other information and investigative instincts upon which Starkey relied in making the arrest form a sufficient evidentiary base to sustain the verdict upon post-trial motions and on appeal.

*Id.* at 20.

[11] The three-judge panel in *Moore* issued three opinions. Judges Coffey and Posner each wrote separate opinions and Judge Gibson filed an opinion that concurred in part and dissented in part. Judge Gibson, however, concurred with Judge Coffey as to the probable cause analysis. *Id.* at 1361 (Gibson, J., concurring in part and dissenting in part).

with cashier as to whether the plaintiff paid for sunglasses and also prohibited the plaintiff from getting the cashier's attention to confirm that he paid for them).[12]

The Court further notes that Carol Gould's statements exonerating Plaintiff are not necessarily dispositive as to a probable cause determination.  A reasonable officer could potentially conclude that Carol Gould was not providing accurate information in an effort to protect her son after-the-fact.  Of course, any such statements by a victim exonerating an alleged defendant may make the case, as a practical matter, extremely weak and lacking in jury appeal.  But, as a matter of law, if an officer had a reasonable basis to doubt the veracity of such statements, probable cause could nevertheless be established in the face of such information.  To this end, Carol Gould informed O'Neal that Plaintiff had "*carte blanche*" pursuant to the POA.  Haroldson Cert., Ex. C at T227:22-228:4.  Yet, when O'Neal asked her about paragraph 4 of the POA and how much Plaintiff could gift himself, Carol Gould responded that she did not know how to answer that question.  *Id.* at 229:16-230:1.  The POA clearly shows that Plaintiff did not have "*carte blanche*" as to himself.  And the POA was the only document that permitted Plaintiff to make payments from Carol Gould's account.

Summary judgment is granted to Defendants as to probable cause.  As a result, both counts—the false arrest and the malicious prosecution—are dismissed.  Nevertheless, the Court also reviews additional elements of both claims.

---

[12] Another aspect of the case concerning policy was vacated and remanded by the Supreme Court, 474 U.S. 805 (1985), for reconsideration in light of a recent Supreme Court decision.  On remand, the Tenth Circuit affirmed its prior decision. *Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307 (10th Cir. 1986).

**b. Arrest**

The Court next considers whether Gould was unlawfully seized.  Defendants argue that Plaintiff cannot prove a false arrest claim because he was never arrested.  Defs. Br. at 17.  Plaintiff contends that he was arrested on February 13, 2015, while he was at the ECPO for his interview.  Plf. Opp. at 13-15.

A traditional arrest constitutes a seizure under the Fourth Amendment.  *Black v. Montgomery County*, 835 F.3d 358, 364-65 (3d Cir. 2016).  "But the scope of what may be considered a seizure is broader."  *Id.* at 365.  A seizure occurs "'when the officer, by means of physical force *or show of authority*, has in some way restrained the liberty of a citizen.'"  *California v. Hodari D.*, 499 U.S. 621, 625 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).  The restraint must be "'willful' and not merely the consequence of 'an unknowing act.'"[13]  *Brendlin v. California*, 551 U.S. 249, 254 (2007) (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989)).  When a restraint occurs through a show of authority rather than physical force, courts apply an objective test to determine whether a seizure occurred.  Specifically, a court considers "'whether the officer's words and actions would have conveyed . . . to a reasonable person' that he was not free to leave."  *United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) (quoting *Hodari D.*, 499 U.S. at 628).  "While an officer merely asking a citizen questions may not be a seizure," the presence of additional factors may turn the questioning into a seizure.  *Black*, 835 F.3d at 365.  For example, certain "demonstration[s] of authority" such as "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching . . . , or the use of language

---

[13] While not raised by Defendants, the Court questions whether the purported seizure on February 13 could be considered willful.  Although Campo's verbal statements conditioned Gould's ability to leave on certain events like turning off the video camera, Campo viewed the interview as non-custodial and believed that Gould was free to leave at any point.  Haroldson Cert., Ex. D at T157:24-13.

or tone of voice indicating that compliance with the officer's request might be compelled.'" *Vargas v. City of Philadelphia*, 783 F.3d 962, 969 (3d Cir. 2015) (quoting *United States v. Crandell*, 554 F.3d 79, 85 (3d Cir. 2009)). Finally, there must be "submission to the assertion of authority." *Id.* at 626. Submission may "take[] the form of passive acquiescence." *Brendlin*, 551 U.S. at 255.

Turning to the relevant events, O'Neal contacted Gould earlier in the month to arrange an interview and Gould voluntarily agreed to come to the ECPO on February 13, 2015. PSOMF ¶ 63. Gould maintains O'Neal did not inform Gould that he was the subject on any investigation. PSOMF, Response to ¶ 67. When Gould arrived at the ECPO on February 13, O'Neal, who was "accompanied by" Campo, asked Gould to go into "what looked to [Gould] like a conference room." Haroldson Cert., Ex. F at T55:8-10. Once in the conference room, O'Neal advised Gould of his *Miranda* rights. PSOMF ¶ 65. Gould then started asking O'Neal and Campo questions about the interview process. After some back and forth, Gould said, "hold on a second" and Campo replied to Gould "you don't control the situation, we do." Haroldson Cert., Ex. D at T155:3-5. After more back and forth, Gould said "[i]f I had known this, I would've come in with an attorney" and Campo said that they were terminating the interview. *Id.* at T157:5-23. There was some additional discussion, and Campo told Gould that "we're going to give some paperwork to you and then you're free to leave" and again, that "we control the situation." PSOMF ¶ 23; Haroldson Cert., Ex. D at T157:11-159:2; T164:2-8. O'Neal then handed Gould the Summons Complaint. Haroldson Cert., Ex. D at T165:22-25. Finally, after more back and forth, Campo told Gould that "[w]e need you to stay there until we turn off the camera and you're free to leave." *Id.* at T167:25-7. This entire exchange lasted less than six minutes. *See* Shanies Decl., Ex. 4. And neither

19

Defendant told Gould he was not free to leave or that he was under arrest at any point during their conversation.  Yet due to Campo's statements, Gould maintains that he was placed under arrest.

The totality of the evidence, which the Court views in a light most favorable to Plaintiff as the non-moving party (and gives Plaintiff the benefit of all reasonable inferences therefrom), demonstrates that Plaintiff was not seized on February 13.  Gould voluntarily went to the ECPO, and O'Neal started the interview by reading Gould his *Miranda* rights.  The Court is aware that *Miranda* rights must be given "in the context of a custodial interrogation."  *Alston v. Redman*, 34 F.3d 1237, 1242 (1994).  However, that does not mean that an officer cannot provide the warnings at other times.  O'Neal testified that it was always his practice to provide a suspect with *Miranda* warnings before an interview at the ECPO, Haroldson Cert., Ex. C at T262:3-20, and Plaintiff has produced no evidence to the contrary.

In addition, during the interview, Campo told Gould that "we control the situation."  PSOMF ¶ 23.  The statement about control does not address whether Gould was required to stay.[14]  The statement does not expressly indicate that Gould had to remain, and neither Defendant told Gould that he was under arrest during the interview.  Finally, Plaintiff does not allege that Campo "physically restrained him, flashed his weapon or made a similar show of authority, or even raised his voice during the meeting."  *Fera v. Baldwin Borough*, 350 F. App'x 749, 754 (3d Cir. 2009) (concluding that plaintiff was not seized during questioning at police station where the plaintiff was asked to "to make a difficult decision" but the defendants "did not restrict his freedom of movement or otherwise prevent him from ending the meeting").  Viewed objectively, Plaintiff

---

[14] Campo's statement appears to be in response to Gould's questions, meaning that Defendants were in charge of the questioning rather than the other way around.  The Court could not discern any indication during the interview that Campo said that he was in control of the situation in response to a statement or question by Plaintiff as to being free to leave.  To the contrary, Plaintiff never asked if he was free to leave or if he was under arrest.  *See* Shanies Decl., Ex. 4.

does not establish that he was barred at any point, through either words or actions, from leaving during the interview.  *See United States v. Ludwikowski*, 944 F.3d 123, 132-34 (3d Cir. 2019) (concluding that a defendant who voluntarily went to police station and was questioned for a very lengthy period of time was objectively not in custody for purposes of *Miranda* custody).

Campo did make statements about Gould's ability to leave after Campo said he was terminating the interview.  Henderson Decl., Ex. D at T157:17-159:3.  Both these statements were conditioned on the completion of brief administrative tasks – the service of paperwork and turning off a video camera.  PSOMF ¶ 23.  Yet, Plaintiff fails to cite any authority indicating that a seizure occurs when a law enforcement officer instructs a person to wait for service of legal documents. Otherwise, law enforcement would commit an unconstitutional seizure each time they attempted to serve a defendant (who was not otherwise in custody).  Similarly, Plaintiff fails to provide authority demonstrating that an illegal seizure occurs when an officer tells a person that the person is free to leave but the officer first has to stop a recording.  A seizure only results from "coercive pressure from state actors resulting in *significant*, present disruption of the targeted person's freedom of movement."  *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012) (emphasis in original) (quoting *Kernats v. O'Sullivan*, 35 F.3d 1171, 1180 (7th Cir. 1994)). Plaintiff does not allege that Campo raised his voice, flashed a weapon, or engaged in any other conduct suggesting that Plaintiff would not be able to leave.  In short, Plaintiff was told that he was free to leave pending the resolution of two short tasks.  As a result, there is no genuine dispute of material fact and Plaintiff fails to establish a triable issue as to his alleged seizure.

For the foregoing reasons, summary judgment on the false arrest claim is also granted to Defendants on this ground.

### 2. Malicious Prosecution

For a Section 1983 malicious prosecution claim, a plaintiff must establish that (1) defendants initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) plaintiff suffered from a "deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *See Allen v. N.J. State Police*, 974 F.3d 497, 502 (3d Cir. 2020) (quoting *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir. 2007)).

Defendants argue that as law enforcement officers, they cannot initiate criminal proceedings. Defs. Br. at 19-20. If law enforcement officers "influenced or participated in the decision to institute criminal proceedings, they can be liable for malicious prosecution." *Halsey*, 750 F.3d at 297; *see also Henderson v. Union County*, No. 14-7708, 2017 WL 4861622, at *4 n.3 (D.N.J. 2017) ("Although prosecutors typically initiate proceedings against criminal defendants, liability for malicious prosecution can also attach when a defendant influences a third party to initiate the proceedings.") (internal quotation omitted).

As to Campo, Plaintiff provides no evidence suggesting that Campo was involved in the decision to initiate criminal charges against him. Plaintiff, therefore, fails to raise a genuine dispute of material fact that Campo initiated criminal proceedings. O'Neal, however, signed the summons complaint against Plaintiff and there is evidence that O'Neal participated to some extent in the decision to institute criminal proceedings. Critically, however, there must also be some evidence of officer misconduct. Namely, "officers who conceal and misrepresent material facts to the district attorney are not insulated from a § 1983 claim for malicious prosecution." *Halsey*, 750 F.3d at 297. Moreover, a plaintiff must demonstrate that the prosecutorial decision to initiate

criminal proceedings was influenced by the law enforcement officer's purported misconduct. *Peterson v. Bernardi*, 719 F. Supp. 2d 419, 431 n.12 (D.N.J. 2010).

Here, Plaintiff fails to point to evidence that would create a genuine dispute of material fact demonstrating that O'Neal engaged in misconduct. Nothing demonstrates that O'Neal fabricated evidence, provided Grady with false information, or otherwise made any material misrepresentations or omissions that influenced Grady's decision to charge Gould with second degree theft. While Grady could not recall the specific decision to charge Plaintiff, Grady acknowledged that an assistant prosecutor approved a complaint before filing, that he assumed that he was the assistant prosecutor who approved Plaintiff's complaint, and that he had no reason to believe that another assistant prosecutor approved Plaintiff's complaint. Haroldson Cert., Ex. E at T92:2-18; 100:17-24; 104:4-24. As to the critical document, the POA, O'Neal freely admitted that at the time of the decision to charge as well as at the time of his deposition, he did not know the full legal implications of the document. And, as noted, Grady testified that he had reviewed the POA and come to his own conclusion as to the HEMS clause. There is no evidence that O'Neal interpreted the scope of the clause or provided Grady with misleading information as to the clause or the POA itself.

For this additional reason, both Defendants are entitled to summary judgment on the malicious prosecution claim.

### IV.    CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (D.E. 99) is **GRANTED**. An appropriate Order accompanies this Opinion.

Dated: February 7th, 2022

John Michael Vazquez, U.S.D.J.